USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:
APR 2 4 2014

3UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                 :
OKSANA S. BAIUL,                                      :
                                 :
                      Plaintiff,       :    13 Civ. 2205 (KBF)
                -v-                   :
                                 :    OPINION & ORDER
                                 :
NBCUNIVERSAL MEDIA, LLC, et al.,                     :
                                 :
                    Defendants.      :
                                 :
------------------------------------------------------ X
                                 :
OKSANA S. BAIUL and OKSANA, LTD.,                    :
                                 :
                    Plaintiffs,      :    13 Civ. 2208 (KBF)
                -v-                   :
                                 :    OPINION & ORDER
                                 :
STEPHEN DISSON, et al.,                              :
                                 :
                    Defendants.      :
                                 :
------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

      Before this Court are several lawsuits brought by Oksana Baiul ("plaintiff" or "Baiul") against a variety of entities—including agents, networks, producers, coaches, and accountants—that seek millions of dollars in damages for events that took place as recently as within the last two years and as long ago as the last two decades.  This Opinion & Order relates to two of those lawsuits; the first suit arises out of alleged commercial uses of Baiul's name and likeness to promote two skating shows in which she never participated, while the second arises out of allegedly defamatory statements about the first lawsuit as reported by two New York City-

area newspapers.  Before the Court are motions for summary judgment seeking the dismissal of these two suits.

For the reasons set forth below, these suits are wholly without merit, defendants' motions for summary judgment are GRANTED, and these actions are DISMISSED.

I.      PROCEDURAL HISTORY

On February 1, 2013, Baiul filed suit against NBC Universal Media, LLC and NBC Sports Network, LP (the "NBC Defendants") and Disson Skating, LLC in New York State Supreme Court, New York County, for violations of the Lanham Act, 15 U.S.C. § 1125(a), and New York Civil Rights Law § 51, as well as common law fraud and negligent misrepresentation (hereinafter, the "Lanham Act Action").  (Lanham Act Action Notice of Removal, Ex. B ¶¶ 28-61, ECF No. 1.)[1]  The Lanham Act Action was removed by Disson Skating, LLC to this Court on April 3, 2013.  (Id. ¶¶ 1-4.)

On February 26, 2013, Baiul[2] filed suit against Stephen Disson and Disson Skating, LLC (the "Disson Defendants") in New York State Supreme Court, New York County, for libel (hereinafter, the "Libel Action").  (Libel Action Notice of Removal, Ex. B ¶¶ 46-221, 13 Civ. 2208, ECF No. 1.)  The Libel Action was removed by the Disson Defendants on April 3, 2013 (id. ¶¶ 1-7), and this Court accepted it as related to the Lanham Act Action on April 8, 2013.

---

[1] Unless otherwise specified, all ECF references in this Opinion correspond to the docket in the Lanham Act Action, 13 Civ. 2205.

[2] Though both Oksana S. Baiul and "Oksana Ltd." are named as plaintiffs in this action, the Court hereinafter refers to both interchangeably as either "Baiul" or "plaintiff" for the sake of simplicity.

By order dated May 1, 2013, fact discovery in both actions was scheduled to close on August 30, 2013. At a status conference on August 29, 2013, plaintiff's counsel stated, for the first time, his desire to amend the complaints in both actions. Following motions to amend the complaints pursuant to Rule 15, the Court granted plaintiff's motion to amend the complaint in the Libel Action on consent in light of the fact that the only change to be made was a change to the damages amount listed in the complaint that had been previously provided to the Disson Defendants in discovery. (9/24/13 Order, 13. Civ. 2208, ECF No. 25.) The Court denied plaintiff's motion to amend in the Lanham Act Action because, "[o]n a substantive level, such amendment would be futile as the allegations set forth in the proposed amended complaint fail to allege sufficient facts to support a claim of successor liability" and "the amendment comes at too late a stage in these proceedings" such that defendants would be prejudiced. (9/24/13 Order, ECF No. 29.)

On October 24, 2013, defendants in both actions moved for summary judgment seeking dismissal of the operative complaints. Plaintiff opposed the motions,[3] and the motions became fully briefed on December 16, 2013.[4]

II.    FACTS

In support of their motion for summary judgment, the NBC Defendants submitted a statement of material facts pursuant to Local Civil Rule 56.1 ("NBC

---

[3] Because plaintiff failed to timely oppose the motions or to otherwise comply with the Court's rules or the Local Civil Rules of this District, the Court only accepted certain filings in opposition to these motions. (See 12/4/13 Order, ECF No. 67; 12/5/13 Order, ECF No. 68.)

[4] Three weeks after the motions for summary judgment became fully briefed, plaintiff again moved for leave to file an amended complaint in the Lanham Act Action. The Court again denied plaintiff's motion as untimely. (1/6/14 Order, ECF No. 86.)

SOF") (ECF No. 43), a response to Baiul's statement of additional facts pursuant to

Local Civil Rule 56.1 ("NBC RSOF") (ECF No. 82), and declarations from, <u>inter alia</u>,

Chelley Talbert ("Talbert Decl." and "Talbert Supp. Decl.") (ECF Nos. 34, 81). The

Disson Defendants also submitted a statement of material facts pursuant to Local

Civil Rule 56.1 ("Disson SOF") (ECF No. 44),[5] a response to Baiul's statement of

additional facts pursuant to Local Civil Rule 56.1 ("Disson RSOF") (ECF No. 79),

and declarations from, <u>inter alia</u>, Matthew DeOreo ("DeOreo Decl." and "DeOreo

Supp. Decl.") (13 Civ. 2208, ECF Nos. 36, 58). Subject to the limitations imposed by

the Court in light of multiple confusing and untimely filings,[6] Baiul submitted

oppositions and statements of additional material facts pursuant to Local Civil Rule

56.1 with respect to both the NBC Defendants ("Baiul-NBC SOF") (ECF No. 69) and

the Disson Defendants ("Baiul-Disson SOF") (ECF No. 62), as well as a declaration

from, <u>inter alia</u>, Raymond Markovich ("Markovich Decl.") (ECF No. 62-1).

Unless otherwise noted, there is no genuine dispute[7] as to the following

material facts.[8]

---

[5] Many of the filings by the Disson Defendants and Baiul in support of and in opposition to the instant motions were filed in both the Lanham Act Action and the Libel Action (and often more than once in each action). For the sake of simplicity, the Court cites to only one copy of these filings in this Opinion.

[6] These issues are described in further detail in the Court's December 4 and 5, 2013 orders. (<u>See</u> ECF Nos. 67-68.)

[7] The Court notes that many of Baiul's "objections" to defendants' statements of material facts are merely argument—assertions that certain facts should not be credited, are irrelevant according to counsel's understanding of the law, or must be read in the context of other facts that are either beside the point or are flatly contradicted by the record. This approach is insufficient to create genuine issues of material fact as to these statements. <u>See Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) ("[M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (citations and internal quotation marks omitted).

[8] The Court notes that Baiul does not oppose the vast majority of the facts put forth by the NBC Defendants and the Disson Defendants in the manner prescribed by the local rules of this District

A.    The NBC Defendants

NBC Sports is the sports division of the NBCUniversal Media, LLC television network.  (NBC SOF ¶ 1.)  NBC Sports broadcasts a diverse array of sports programming, and produces or co-produces hundreds of hours of original sports programming a year.  (Id. ¶¶ 2-3.)  NBC Sports sells hundreds of hours of broadcast time annually to third-party producers, so that they can air their sports programming on the NBC broadcast television network ("NBC") or the NBC Sports channel.  (Id. ¶ 4.)  NBC Sports airs over nine thousand hours of sports programming annually on NBC and the NBC Sports channels combined.  (Id. ¶ 5.)  Advertising for programming produced by NBC Sports is one of the primary sources of revenue for NBC Sports.  (Id. ¶ 6.)

B.    The Disson Defendants

Disson Skating, LLC ("Disson"), organized under the laws of Virginia, is a third-party producer that purchases broadcast time from NBC Sports to air pre-packaged programming on NBC.  (NBC SOF ¶ 12; Disson SOF ¶ 4.)  Disson produces, among other things, figure skating shows, which have aired on NBC, CBS, ESPN, USA, Bravo, Hallmark Channel, TBS, Style, and Ovation.  (NBC SOF ¶¶ 13-14.)  Stephen Disson is a skating producer and principal of Disson.  (Disson SOF ¶ 3.)  Disson came into existence in March 2012; prior to March 2012, and at

---

(even in the later, untimely filings that the Court has reviewed but determined not to consider for purposes of these motions).  See Local Civil Rule 56.1(b) ("The papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried.").  Accordingly, these facts are deemed admitted for the purposes of these motions.  See Local Civil Rule 56.1(c).

the time of the events relevant to the Lanham Act Action, a separate limited

liability company called Disson Skating, LLC of Pennsylvania ("Disson PA") was in

operation.  (Disson SOF ¶¶ 4-5, 7.)[9]

The format for a Disson figure skating show includes figure skating

performances by a number of Olympic, world, or national figure skaters and a live

musical act.  (NBC SOF ¶ 15.)  Disson figure skating shows are taped before a live

ticket-buying audience for later broadcast on a national television network.  (Id. ¶¶

16-17.)  Disson has purchased broadcast time from NBC Sports to broadcast its

figure skating shows on NBC since 1989.  (Id. ¶ 18.)

C.     Oksana Baiul

Baiul is a world famous figure skater who won the 1993 World

Championship, Ladies Figure Skating and became the 1994 Olympic Gold Medalist

in Ladies Figure Skating.  (Disson SOF ¶ 1.)  According to Baiul, she is "the highest

figure skater who's been on TV and my Olympics were the highest rated Olympics."

(DeOreo Decl. Ex. G at 382.)  Baiul notes that she has "a title given to me by the

media queen of the ice," and she considers herself a "superstar," and a "global

entertainer."  (Id. Ex. G at 382, 424.)

"Oksana Ltd." is a Pennsylvania corporation that is 100% owned by Baiul; it

is the legal entity that has and continues to be used by Baiul for some or all of her

contracts and business.  (Disson SOF ¶ 2.)

---

[9] For the sake of simplicity, the Court refers to both Disson entities as "Disson" herein.  In light of the Court's holdings in Sections IV and V, infra, the Court need not reach the issue of successor liability in order to dismiss the complaints in both actions.

D.     The 2010 Time-Buy Between NBC Sports and Disson

When selling broadcast time to third-party producers, NBC Sports frequently enters into "time-buy agreements" with the third-party producer. (NBC SOF ¶ 7.) A time-buy agreement is when a third-party producer purchases time to broadcast its show on an NBC network and takes on the responsibility of production, marketing, and sale of the program (hereinafter, a "Time-Buy"). (Id. ¶ 8.)

In Time-Buys, the third-party producer recoups its investment by selling advertising to insert in the program and then retaining the proceeds of those sales. (Id. ¶ 9.) Ratings from shows broadcast under Time-Buy agreements do not factor into overall network ratings, though the shows may contain a few minutes of on-air promotion for future NBC telecasts during a two-hour show. (Id. ¶ 10; Baiul-NBC SOF ¶ 70.) Third-party producers who have entered into a Time-Buy are required to submit commercials and advertisements to NBCUniversal's standards department 72 hours before a broadcast. (NBC SOF ¶ 12.)

Disson and NBC Sports entered into a Time-Buy agreement dated March 2010, which was amended on September 16, 2010 (the "2010 Time-Buy").[10] (Id. ¶ 19.) The 2010 Time-Buy covered Disson's purchase of broadcast time for the 2010-2011 and 2011-2012 seasons. (Id. ¶ 20.) Disson contracted to purchase a minimum of sixteen hours of broadcast time in both the 2010-2011 and 2011-2012 seasons, which corresponded to at least eight, two-hour figure skating shows. (Id. ¶¶ 21-23.) Disson agreed to pay NBC Sports $400,000 per two-hour show, regardless of the

---

[10] The Court rejects Baiul's repeated characterizations of the 2010 Time-Buy as a "co-production" agreement as lacking both a factual and legal basis.

7

identity of the figure skaters or musical acts that actually performed in each show. (Id. ¶¶ 24-27.) The 2010 Time-Buy was amended to add a ninth one-hour show in the 2010-2011 season at an additional cost to Disson of $200,000. (Id. ¶ 28.)

Under the 2010 Time-Buy, Disson was responsible for all elements of production of the live figure skating show, including taping the show for television broadcast. (Id. ¶¶ 29-31.) Disson represented and warranted to NBC Sports that it had obtained the necessary rights for the performances, including the featured figure skater talent and music. (Id. ¶ 38.) Disson hired IMG, an independent contractor, to produce the shows; IMG was also responsible for the post-production work on the taped shows. (Id. ¶¶ 32-33.) Aside from payment of on-air talent by NBC Sports, Disson was responsible for all other production costs, expenses, and liabilities of the figure skating shows covered by the 2010 Time-Buy. (Id. ¶ 34; Markovich Decl. Ex. 35 at NBCU 00009.) Disson selected the figure skaters that appeared in each figure skating show, and conducted all negotiations in connection with their appearance. (NBC SOF ¶¶ 35-36.) NBC Sports was not a party to Disson's agreements with either the figure skaters, IMG, or the venues. (Id. ¶ 37.)

Once post-production work was complete, Disson (or IMG) delivered a tape of the show to the NBC Sports production department on the Thursday or Friday before the scheduled weekend broadcast. (Id. ¶ 39-40.) A member of the NBC Sports production department reviewed the tape to confirm it was appropriate for air; this included confirming that the tape complied with production requirements, such as requisite audio quality and appropriate number and length of

commercial spots, and fact-checking to ensure any on-screen graphics were accurate. (Id. ¶ 41.)

Disson was entitled to sell advertisements to insert in each program in the form of commercials, billboards, and vignettes, without any limitations as to price. (Id. ¶¶ 42-43.) Disson retained all proceeds from any advertisements, commercial elements and sponsorships it sold. (Id. ¶ 44.) The fee Disson paid NBC Sports was not dependent on Disson's ability to sell advertising for any particular broadcast or on any other variable. (Id. ¶ 46.) NBC Sports did not participate in any conversations with advertisers, review any agreements Disson reached with advertisers, or otherwise participate in any attempts to solicit advertisers for any broadcasts covered by the 2010 Time-Buy. (Id. ¶ 47.)

One to two minutes during the two-hour broadcast were reserved for the insertion of an announcement for upcoming NBC network telecasts. (Id. ¶ 48.) One to two minutes were also reserved for the insertion of commercials sold by local NBC affiliates (which were not sold against the content of the program). (Id. ¶ 49.) NBC Sports did not discuss the content of the Disson programs with the local stations. (Id. ¶ 50.)

NBC Sport's only commitment to promote the broadcasts was "on-air in NBC Sports programming in accordance with NBC Sports' usual and customary practices and consistent with NBC Sports' promotion of similar sports programming." (Id. ¶ 53; Talbert Decl. Ex. 5 at NBCU 00013.) NBC Sports' promotion of the broadcasts was typically limited to a "lead-in" voiceover or vignette created by the NBC Sports

9

production department, which aired at the end of the preceding show and encouraged viewers to remain on the channel to watch the upcoming Disson broadcast. (NBC SOF ¶ 54.)

      E.    <u>Baiul's Interactions with Steve Martin and Disson in 2011</u>

      In May 2011, Baiul and her publicist Sarah Hall met with Steve Martin regarding Martin potentially becoming Baiul's agent. (Disson SOF ¶ 9.) Martin is an agent for The Agency Group and has worked as an agent for approximately twenty years. (<u>Id.</u> ¶ 8.) Baiul had previously been "retired for a bit" and was looking to "re-enter the skating world"; she had only performed in "a couple" paid skating shows between 2006 and 2011 (one in 2010, none in 2011). (<u>Id.</u> ¶¶ 9-11.) During the meeting, Baiul and Martin discussed the fact that Martin, on behalf of Baiul, would find work for Baiul in skating shows in the United States. (<u>Id.</u> ¶ 12.) Baiul and Martin discussed the possibility of Baiul performing in skating shows produced by Disson; Martin asked Baiul what she thought of Stephen Disson's shows, and Baiul indicated that "a lot of people like me were not doing his shows." (DeOreo Decl. Ex. G at 71-73.)

      Following this meeting, as of June 2011, Martin understood Baiul to have hired him as her agent; Martin believed he had authority to negotiate skating deals for Baiul and to commit her to such deals. (Disson SOF ¶¶ 15-16.) According to Martin, he had a verbal agreement with Baiul but not a written contract. (<u>See</u> Markovich Decl. Ex. 73 at 98-104.) At this time, Baiul was aware that Martin was speaking to Disson and other skating show producers on her behalf, and never told

Martin not to do so. (Disson SOF ¶ 18.)  In fact, in July 2011, Baiul expected that Martin would be receiving offers from skating show producers for her to perform in such skating shows. (Id. ¶ 19.)

On June 22, 2011, Martin emailed Stephen Disson and indicated that he was working with Baiul, who would be skating in two skating shows that were being produced by two other producers. (Id. ¶¶ 20-21.)  During a conversation on July 12, 2011, Martin told Disson that he had signed Baiul as a client and that Baiul wanted to know if he had space for her in any of his NBC skating shows. (Id. ¶ 22.)  During the same conversation, Disson offered Martin a deal for Baiul to perform in two of Disson's upcoming shows under the 2010 Time-Buy—a show with the band Styx in December 2011 in Greenville, South Carolina (the "Improv-Ice Show"), and a show with the recording artist Kenny G in January 2012 in the Seattle, Washington area (the "Moments of Love Show") (collectively, the "Disson Shows"). (Id. ¶ 23.)  Disson and Martin discussed many of the details of the offer during this conversation, and Disson sent a follow-up email later that day to Martin setting forth many of these same details. (Id. ¶¶ 24-25.)  Martin forwarded this email to Baiul the next day, July 13, 2011, and explained: "As we discussed, here are 2 more specials, these from Steve Disson . . . Both are offering $10,000+expenses.  If you'd like me to arrange a call w/Steve, I'd be happy to." (DeOreo Decl. Ex. L.)  According to Baiul, this email attached two documents containing certain background information about the Disson Shows, and which used Baiul's name and likeness; according to Martin, he did not recall opening the attachments to this email. (See Disson SOF ¶¶ 50-51.)

According to Martin, Baiul accepted this offer; according to Baiul, she had additional questions about the amount of the offer. (Id. ¶ 27; Baiul-Disson SOF ¶ 27.) Martin communicated his belief that Baiul had accepted the offer to Disson; in a July 15, 2011 email, Martin stated that Baiul was "ok with the offers and wants to have a creative conversation with you, as you +I [sic] discussed." (DeOreo Decl. Ex. E. at 28-29, Ex. N at DISSON 000826.) Subsequently, on July 18, 2011, Martin's assistant spoke to Baiul and confirmed that she had accepted Disson's offer; Martin's assistant, who was authorized to convey this information on Martin's behalf, emailed Disson that day and stated: "I spoke to Oksana, she has confirmed she is good for both the NBC dates. And confirmed she spoke to both yourself and Lee Ann. I will follow up with the contracts shortly." (DeOreo Decl. Ex. O at DISSON 000285, Ex. P at 19-21, 52-53, 60-64.) Baiul and Disson also spoke on July 18, 2011 and discussed the shows; after the call, Disson emailed Martin and stated "Just spoke at great length with Oksana and we are good to go here." (DeOreo Decl. Ex. C at 173-180, Ex. O at DISSON 000286.)

On July 20, 2011, Baiul emailed Martin that she was sick and could not perform in any of the shows. (Disson SOF ¶ 38.) Baiul stated: "Steve I am werry sorry I am werry suck I can't do this shows I am suck with my colitias. So sorry." (DeOreo Decl. Ex. Q.) Martin responded: "I'm so sorry to hear you're not feeling well. What shows are you referring to? Steve Dissons [sic] shows or all of them? Hope you feel better." (Id.) In an email to Baiul dated August 7, 2011, Martin stated: "I've notified the 3 producers of the skating events that you will not be

appearing for them, due to a health issue.  At this point, I don't feel that myself or The Agency Group can effectively represent you.  If any inquiries come to us, we will pass them along directly to you.  I hope your health improves and wish you the best." (Id. Ex. S.)

Thereafter, on August 8, 2011, Martin emailed Disson and stated: "Please be aware that Oksana has informed me that she not [sic] going to perform at any of the skating shows she's agreed to, due to health reasons.  Also, we are no longer representing Oksana.  If you have any questions, feel free to call.  Sorry for all the inconvenience."  (Id. Ex R at 2.)  This was the first time Disson learned that Baiul was not going to be in the Disson Shows.  (Disson SOF ¶ 42.)  In response to Disson's requests for an explanation as to why Baiul was no longer interested in participating in the Disson Shows, on August 12, 2011, Baiul stated in an email: "Steve the reason is I don't want to skate anymore!"  (DeOreo Decl. Ex. T at 1.)

F.     The 2011-2012 Disson Skating Series

The eight shows in the 2011-2012 Disson skating series were filmed live from September 2011 through January 2012 and were broadcast on NBC through February 2012.  (NBC SOF ¶ 70.)  Over three dozen different figure skaters participated as skaters or hosts in the events, including U.S. Olympic gold medalists Brian Boitano, Kristi Yamaguchi, Peggy Flemming, and Sarah Hughes. (Id. ¶ 71.)

During the 2011-2012 skating show season, Disson retained an independent publicist, Lynn Plage, to promote its live events and the television broadcasts.  (Id.

¶ 51.)  Plage acted as a liaison between Disson and NBC Sport's communications department.  (Id. ¶ 52.)

In April 2011, Disson sent the NBC Sports Programming department a preliminary plan for the 2011-2012 series.  (Id. ¶ 72.)  The one-page plan included the location of the live venue, broadcast date and time, and the proposed host and host fees for each show—it did not include the identity of any figure skater or musical act.  (Id. ¶¶ 73-74.)  Disson never sent a comprehensive list of figure skaters or musical acts for the 2011-2012 season to the NBC Sports programming department.  (Id. ¶ 75.)  NBC Sports first received comprehensive participant lists from Plage (on October 21, 2011); Plage sent those lists solely to the NBC Sports communications department.  (Id. ¶ 76; Talbert Decl. Ex. 13.)

NBC Sports did not select, correspond with, or contract with the figure skating or musical talent that Disson engaged to perform in any show.  (NBC SOF ¶ 60.)  NBC Sports did not choose, communicate with, or collect any proceeds from the venues.  (Id. ¶ 61.)  NBC Sports played no role in the production of any show.  (Id. ¶ 62.)  NBC Sports did not participate in the advertising or promotion of, or collect any revenue from, the live events, ticket sales, or merchandise.  (Id. ¶ 63.)  NBC Sports did not solicit or engage with sponsors or advertisers for any broadcast or receive any revenue for advertising or sponsorships sold against the broadcasts. (Id. ¶ 64.)

The venues hired by Disson paid for and handled all advertisements associated with the Disson Shows; none of those advertisements (which Disson

reviewed and approved) included Baiul's name. (Disson SOF ¶¶ 56, 58, 74, 107-110.)  On July 14, 2011, Disson sent the BI-LO Center, the venue for the Improv-Ice Show, a background information packet that listed Baiul as a "Suggested Skater." (Id. ¶ 86.)  There is no evidence in the record to suggest that individuals at the BI-LO Center sent this packet or any other materials referencing Baiul to anyone in promoting the Improv-Ice Show.  (Id. ¶¶ 87-89.)

On July 21, 2011, after Baiul had committed to the Improv-Ice Show but before Disson learned that she would not be participating, Disson emailed Jackie Dyson at Zenith Media a proposal for the company Stouffer's to be a title sponsor of the Improv-Ice Show (the "Stouffer's Proposal").  (Disson SOF ¶ 76.)  The Stouffer's Proposal included Baiul's name and likeness.  (Id. ¶ 77.)  On August 2, 2011, Dyson emailed Disson that Stouffer's was not interested in becoming a title sponsor for the Improv-Ice Show.  (Id. ¶ 78.)

On July 21, 2011, after Baiul had committed to the Improv-Ice Show but before Disson learned that she would not be participating, Disson emailed Tamara Rabi at Optimedia a proposal for the company Stride Rite to be a title sponsor of the Improv-Ice Show (the "Stride Rite Proposal").  (Id. ¶ 81.)  The Stride Rite Proposal also included Baiul's name and likeness.  (Id. ¶ 82.)  On July 25, 2011, Rabi emailed Disson that Stride Rite was not interested in becoming a title sponsor for the Improv-Ice Show.  (Id. ¶ 83.)

According to Baiul, the radio stations Magic 98.9 and ROCK101 used Baiul's name on their websites in order to promote the Improv-Ice Show.  (Baiul-NBC SOF

¶¶ 9(3), (4); Markovich Decl. Exs. 9, 10.)  Baiul cites no evidence that either Disson or the NBC Defendants had any involvement in the posting of Baiul's name on these websites.  (NBC SOF ¶ 152; Disson SOF ¶ 57.)

G.    The February 2, 2012 Press Release

To inform other media outlets about the Disson broadcasts, the NBC Sports communications department prepared an informational press release about each program and posted it on NBCUniversal's Media Village a few days before each broadcast.  (Id. ¶ 65.)[11]  Media Village is a website for editorial use by United States-based media—it includes news releases about company-wide topics, such as NBCUniversal's year-to-date performance, and information about upcoming broadcasts.  (Id. ¶ 66.)  Other media outlets (such as local newspapers) rely on Media Village to create and report on television listings.  (Id.)  Media Village is not targeted to the television viewing audience or the general public; in fact, full access to the site requires registration with United States media credentials.  (Id. ¶¶ 67, 69.)  Media Village does not contain episode guides, video clips, full schedule line-ups, merchandise sales, or social media interaction.  (Id. ¶ 68.)

---

[11] Baiul argues that all statements of material fact (including this one) that are based on the declarations of Justine DeMaio and Adam Freifeld, which were submitted by the NBC Defendants in support of their motions for summary judgment, should be stricken and disregarded because these individuals were not produced for depositions in response to a notice of deposition served on the NBC Defendants on July 29, 2013.  (Baiul NBC SOF ¶ 2.)  This argument is rejected.  Baiul's July 29, 2013 deposition notice required the NBC Defendants to designate and produce an individual to testify on behalf of the noticed entities, "NBCUniversal Media LLC" and "NBC Sports Network L.P.," pursuant to Federal Rule of Civil Procedure 30(b)(6) with respect to certain identified categories. (See Markovich Decl. Ex. 1.)  The NBC Defendants did so by designating and producing Jonathan Miller, President of NBC Sports Programming.  (See Talbert Supp. Decl. Exs. 1, 2.)  Baiul never noticed declarations for Freifeld or DeMaio, although each was identified by the NBC Defendants in their June 17, 2013 Rule 26 disclosures.  (See id. Ex. 3.)  These declarations are thus properly considered by the Court on this motion.  See Fed. R. Civ. P. 56(c)(4); see also United Magazines Co. v. Murdoch Magazines Distrib., Inc., 353 F. Supp. 2d 433, 442 n.8 (S.D.N.Y. 2004).

From October 2011 through February 2012, Justine DeMaio was an employee with the NBC Sports communications department, whose responsibilities included preparing informational press releases for Media Village. (Id. ¶ 77.)  On October 21, 2011, Plage emailed DeMaio to request DeMaio's assistance in coordinating radio interviews to promote upcoming broadcasts. (Id. ¶ 78.)  Plage attached multi-page fact sheets ("Fact Sheets") for the shows to her October 21 email, which listed: (a) the name of the show; (b) a brief description of each show; (c) the location of the live event; (d) a list of the participating figure skaters with brief biographical information; (e) the identify and brief biography of the hosts; and (f) the musical guest. (Id. ¶¶ 79-80.)  Plage did not attach a fact sheet for one of the eight shows and attached two different versions of a fact sheet for another. (Id. ¶ 81.)  When DeMaio followed up with Plage on the missing information, Plage sent back a press release on the missing show but noted that one of the figure skaters that was identified therein as performing (not Baiul) had not appeared in the show. (Id. ¶ 82.)  Plage explicitly instructed DeMaio to "take her name out." (Id. ¶ 83.) According to DeMaio, it was her expectation that Plage would continue to notify her of any other inaccuracies in the Fact Sheets. (Id. ¶ 84.)

Plage's October 21, 2011 email attached a Fact Sheet for the season's final show, the Moments of Love Show. (Id. ¶ 85.)  The Fact Sheet's description of the event stated: "**WHAT: Pandora® Unforgettable Moments of Love on Ice** brings romance to the ice rink.  Olympic, World and National medalists, led by **Ekaterina Gordeva and Oksana Baiul**, perform numbers to love-inspired music

17

performed live to entertain the audience." (Id. ¶ 86.) The Fact Sheet also included Baiul second among the list of ten participating figure skaters and identified her as "1994 Olympic Champion" and "1993 World Champion." (Id. ¶ 87.)

On January 31, 2012, shortly before the February 4, 2012 scheduled television broadcast of the Moments of Love Show, DeMaio and Plage exchanged emails to arrange a radio interview for Sasha Cohen, who had been a featured skater in the Show. (Id. ¶¶ 88-89.) Plage routinely enlisted DeMaio's assistance in coordinating radio interviews for the season's broadcasts. (Id. ¶ 90.) DeMaio asked Plage to send her Cohen's "bio and a fact sheet about the event." (Id. ¶ 91.) Later that day, Plage emailed DeMaio a biography of Cohen and a separate document entitled "TUNE-IN ALERT" containing information about the Moments of Love Show (the "Tune-In Alert"). (Id. ¶ 92.) The Tune-In Alert was intended primarily for use in conjunction with the radio interviews and provided the date and time of the Show's broadcast. (Id. ¶ 93.) The Tune-In Alert was thus less detailed than the Fact Sheets Plage sent DeMaio on October 21, 2011—it did not, for example, include a description of the show or biographical information about the skaters or the hosts. (Id. ¶¶ 94-95.) The Tune-In Alert did not list Baiul as among the skaters. (See Talbert Decl. Ex. 16.)

Within the next few days, DeMaio drafted an informational press release about the Moments of Love Show to post on Media Village (the "Press Release"). (NBC SOF ¶ 98.) The Press Release, dated February 2, 2012, stated, in substance that Sasha Cohen, Ekaterina Gordeeva, and Oksana Baiul "headline" and "will

18

perform" in the show.  (See Talbert Decl. Ex. 17.)  It states: "This love-inspired performance will be led by 2006 Olympic Silver Medalist and U.S. Champion Sasha Cohen, two-time Olympic Champion and four-time World Pairs Champion Ekaterina Gordeeva and 1994 Olympic Champion and 1993 World Champion Oksana Baiul." (Id.)

In drafting the Press Release, as was her practice, DeMaio relied on the Fact Sheet for the Moments of Love show for information about the show's contents. (NBC SOF ¶ 96.)  According to DeMaio, she did not realize that Baiul, as well as Tanith Belbin and Ben Agosta, were not identified as skaters in the Tune-In Alert although they had been included in the Fact Sheet for the Moments of Love Show. (Id. ¶¶ 97, 108.)  It was DeMaio's understanding that Baiul was in the Moments of Love Show when she drafted the Press Release for the Show and included Baiul in it.  (Id. ¶ 103.)  DeMaio never saw a broadcast of the Moments of Love Show.  (Id. ¶ 104.)  No one from NBC Sports or NBCUniversal told DeMaio to include Baiul in the Press Release.  (Id. ¶ 105.)  Neither Plage nor anyone else told DeMaio that Baiul was not in the Moments of Love Show.  (Id. ¶ 106.)  Plage never told DeMaio that the Fact Sheet for the Moments of Love Show was inaccurate or that it should not have included Baiul.  (Id. ¶ 107.)

DeMaio personally posted the Press Release on Media Village on Thursday, February 2, 2012, two days before the broadcast of the Moment of Love Show on Saturday, February 4, 2012.  (Id. ¶ 112.)  DeMaio's supervisor reviewed the Press Release before it was posted solely for editorial purposes.  (Id. ¶ 113.)  No one in the

NBC Sports programming, production, or promotions departments reviewed the Press Release before it was posted on Media Village. (Id. ¶¶ 114-16.) DeMaio also never shared the Press Release with Plage or anyone affiliated with Disson. (Id. ¶ 117.) No Disson entity had any involvement in the issuance of the Press Release or knowledge of it prior to its posting. (Disson SOF ¶¶ 61-62.)

NBC Sports did not create or publish any information besides the Press Release—on television, on the Internet, or via any other media—about Baiul's participation in the Moments of Love Show or any other show in Disson's 2011-2012 skating series. (NBC SOF ¶¶ 118, 150-53, 155-61.)

H.     NBC Learns of the Error in the Press Release

In a letter to NBCUniversal dated May 15, 2012, Peter Skolnik, an attorney for Baiul, referenced the Press Release and stated that Baiul had not participated in the Moments of Love Show and had declined Disson's invitation to appear in the show. (Id. ¶¶ 119-121.) Skolnik asserted in his letter that the inclusion of Baiul's name in the Press Release was a violation of multiple statutes, and requested that NBCUniversal contact him "so that litigation may be avoided." (Id. ¶¶ 122-23.) Skolknik's May 15, 2012 letter was NBCUniversal's first notice of an error in the Press Release. (Id. ¶ 125.) NBC Sports immediately removed the Press Release from Media Village after receiving the letter. (Id. ¶ 126.)

NBC Sports determined that no television advertisements or promotions for the Moments of Love Show broadcast included Baiul. (Id. ¶ 128.) NBC Sports was able to locate only one other media source, TheEntertainmentHotline.net, that

20

appeared to have reported on the Press Release. (Id. ¶ 129.) The Entertainment Hotline website is not a NBCUniversal or NBC Sports website. (Id. ¶ 134.) No Disson company had any involvement with this posting. (Disson SOF ¶ 73.)

In a letter to Skolnik dated May 25, 2012, NBCUniversal in-house counsel Gillian Lusins stated that its "internal investigation has determined that the inclusion of Ms. Baiul's name in the [Press] Release was an unfortunate error." (Talbert Decl. Ex. 21 at NBCU 00174.) Lusins stated that the error was caused by DeMaio's reliance on the outdated information—the Fact Sheet. (NBC SOF ¶ 131.) Lusins stated that no television advertisements or promotions for the Moments of Love Show had included Baiul. (Id. ¶ 132.) Finally, Lusins stated that it had been able to locate only one other source that had reported on the Press Release. (Id. ¶ 133.) According to Lusins, Disson was not involved in the drafting or sending of the May 25, 2012 letter. (Disson SOF ¶ 103.)

I.    Defamation

Baiul's defamation claims against the Disson Defendants in the Libel Action[12] stem from alleged statements by Stephen Disson as attributed to him in articles published in the New York Daily News (the "Daily News") on February 4, 2013 and in the New York Post (the "Post") on February 5, 2013. (Id. ¶ 115.) Both articles were about the Lanham Act Action. (Id. ¶ 116.)

According to the Daily News, Disson stated that "his company never publicly disclosed his negotiations to have Baiul appear." (Markovich Decl. Ex. 50 at 2.) The Daily News quotes Disson as saying "[i]t's just weird" with respect to the suit.

---

[12] Neither the NBC Defendants nor any NBC entities are defendants in the Libel Action.

(Id.) The Daily News says that, with respect to their July 18, 2011 conversation, "Baiul then called [Disson] to say how much she appreciated the offer, given how poorly she'd performed on prior shows." (Id.) The Daily News quotes Disson as saying "Each time she had been a little flaky. One time, she didn't show up. She was out shopping. Another time, she refused to do a retake after she had fallen. . . . She was grateful for a third chance. We had a good talk. I said I'd send a contract." (Id. Ex. 50 at 3.)

Disson testified at his deposition that the basis for his statement concerning Baiul not showing up to a rehearsal because she was "out shopping" was a conversation he had with figure skater Brian Boitano. (Disson SOF ¶ 141.) Baiul admitted that her former agent heard the same facts as described by Disson. (Id. ¶ 142.) Baiul also admitted that, prior to 2011, it was gossip in the skating business that Baiul missed an event because she was out shopping. (Id. ¶ 143.) Baiul testified at her deposition that she cannot recall whether she ever missed a dress rehearsal. (Id. ¶ 144.)

According to the Post, Disson stated that Baiul "approached him through an agent in mid-2011 and asked to be included in the shows, then backed out within weeks after he agreed—well before he started ads for them." (Markovich Decl. Ex. 51.) The Post quotes Disson as saying: "We never announced Oksana in either show or featured her in any of our advertising or promotion materials." (Id.)

III.  STANDARD OF REVIEW

Summary judgment may not be granted unless the movant shows, based on admissible evidence in the record placed before the court, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In making a determination on summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted); see also Price, 808 F. Supp. 2d at 685 ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory

statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

IV.   THE LANHAM ACT ACTION

Baiul asserts four causes of action against the NBC Defendants and Disson— (A) violation of the Lanham Act, 15 U.S.C. § 1125(a); (B) violation of New York Civil Rights Law § 51; (C) common law fraud; and (D) negligent misrepresentation.[13] Even assuming Baiul has sued the correct Disson entity,[14] these claims are wholly without merit.

A.   Lanham Act

According to Baiul, the allegedly actionable unauthorized uses of her name by defendants are: (1) with respect to the Moments of Love Show, in the Press Release, on The Entertainment Hotline website, and in certain background information about the Moments of Love Show sent by Disson to Martin on July 12,

---

[13] Baiul has withdrawn her fifth cause of action for spoliation. (See Baiul-NBC Opp. at 25-26, ECF No. 52.)

[14] Disson argues that the alleged uses of Baiul's name and likeness were by non-party Disson PA, not defendant Disson Skating (which did not exist at the time of the relevant events). (See Disson Mem. of Law at 13, ECF No. 51.)

2011; and (2) with respect to the Improv-Ice Show, on the websites for the radio stations Magic 98.9 and Rock 101.[15]  (See Baiul-NBC SOF ¶ 9.)

Section 43(a) of the Lanham Act prohibits a person from "us[ing] in commerce any . . . false designation of origin . . . which (a) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (b) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . ."  15 U.S.C. § 1125(a)(1).  This statute "gives a statutory remedy to a party injured by another's 'false designation of origin' whether or not the party has secured a federal registered trademark for the item at issue."  L. & J.G. Stickley, Inc. v. Canal Dover Furniture Co., Inc., 79 F.3d 258, 262 (2d Cir. 1996) (citing LeSportsac, Inc. v. K Mart Corp., 754 F.2d 71, 75 (2d Cir. 1985).

> 1.  Use in Commerce

As the language of the statute indicates, liability under Section 43(a) requires, at a minimum, that the plaintiff establish that the defendant used the false designation of origin in commerce.  See 15 U.S.C. § 1125(a)(1); 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, (2d Cir. 2005).  The Lanham Act defines

---

[15] The remaining "unauthorized uses" listed by Baiul are not asserted as a basis for the causes of action in the operative complaint in the Lanham Act Action.  In fact, the Court denied Baiul's motion to amend the complaint in the Lanham Act Action in order to add these additional alleged unauthorized uses.  (See 9/24/13 Order.)  In any event, even if the Court were to consider these unauthorized uses as properly plead (which they are not), they would also be dismissed on these motions for the reasons set forth herein.

"use in commerce," in relevant part, as "the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127. "For purposes of this chapter, a mark shall be deemed to be in use in commerce . . . on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." Id.; Kelly-Brown v. Winfrey, 717 F.3d 295, 306 (2d Cir. 2013) ("[I]n determining whether the plaintiffs have satisfied the 'use in commerce' requirement, we ask whether the trademark has been displayed to consumers in connection with a commercial transaction.").

Simply put, there are no genuine issues of material fact for trial as to the uses of Baiul's name and likeness alleged in the complaint under the Lanham Act. Many of the uses do not constitute uses by the NBC Defendants, the Disson Defendants, or any Disson entity at all, and those that do are plainly not uses in commerce.

With respect to the uses of Baiul's name on the websites for The Entertainment Hotline, Magic 98.9, and Rock 101, there is absolutely no evidence in the record connecting defendants to these uses—there is no evidence that defendants owned, operated, or were affiliated with these websites, that they sent or provided these websites with any information about the Disson Shows referencing Baiul, or that they had any involvement at all with the posting of Baiul's name on these websites. In fact, the undisputed evidence in the record is that the venues hired by Disson handled all advertisements associated with the Disson Shows, Disson reviewed and approved each of these advertisements, and

none of them included Baiul's name. Though Disson sent the venue for the Improv-Ice Show, a background information packet that listed Baiul as a "Suggested Skater" on July 14, 2011 (at a time when Disson was negotiating this possibility with both Martin and Baiul), there is no evidence in the record that the venue sent this packet to anyone else or that Disson or any Disson entity instructed it to do so.

With respect to the background information concerning the Moments of Love Show sent by Disson to Martin (Baiul's agent or, at the very least, potential agent[16]) on July 12, 2011, there is no evidence in the record that this email or its attachments were ever displayed to consumers or sent to anyone else besides Martin. To the contrary, the record evidence concerning this email is that (1) Martin does not ever recall opening the attachments (which reference Baiul); and (2) Baiul admitted during her deposition that she has no evidence that this email or its attachments were ever sent to anyone else besides her and Martin (see DeOreo Decl. Ex. G at 141, 143).

Finally, with respect to the Press Release, Baiul also fails to create a genuine issue of material fact for trial as to liability under the Lanham Act because the NBC Defendants did not use the Press Release in commerce. The record evidence establishes that the Press Release was issued on February 2, 2012 and posted on Media Village, a website used to provide United States-based media with information about upcoming NBC broadcasts. Media Village is not targeted to the television viewing audience, advertisers or the general public; full access to the site

---

[16] The Court need not resolve the issue of whether Baiul actually hired Martin to represent her as either a legal or factual matter for purposes of these motions.

requires registration with United States media credentials.  The NBC Defendants played no role in selling advertisements against the Moments of Love Show broadcast and, because the Press Release was published approximately 48 hours before the broadcast, could have had no effect on Disson's advertising sales (which were required to be submitted to NBC for standards review at least 72 hours prior to broadcast).  Baiul's primary argument that the Press Release was used in commerce by the NBC Defendants appears to be the fact that NBC used some commercial time (a few minutes during a two-hour show) to promote upcoming programs on NBC, and that these commercials thus resulted in higher ratings and advertising revenue for NBC.  (See Baiul-NBC Opp. at 24, ECF No. 52.)  Baiul, however, does not provide any facts in support of this theory (or any citations to the record in this portion of her brief), and, as such, provides no facts that tie this theory—that NBC made more than the flat $400,00 per-broadcast fee from Disson for the Disson Shows—to the issuance of the Press Release.

2.  Damages

Baiul's Lanham Act claims also fail because she has failed to show that she is or is likely to be damaged by defendants' allegedly false designations of origin concerning the Disson Shows.[17]  See 15 U.S.C. § 1125(a).  Section 35(a) of the Lanham Act provides that plaintiff who is successful under Section 43(a) may recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action."  15 U.S.C. § 1117(a).

---

[17] As discussed infra, Baiul's other claims—in both the Lanham Act Action and the Libel Action—also fail because of the speculative (at best) nature of the evidence offered by Baiul as to damages.

To call Baiul's arguments as to damages speculative is indeed charitable—she offers <u>no</u> credible evidence whatsoever that she has suffered or will suffer any compensable damages as result of defendants' alleged conduct.

Baiul seeks at least $1,006,487 in compensatory damages for each of her four causes of action in the Lanham Act Action, as well as $500,000 in punitive damages. (<u>See</u> Markovich Decl. Ex. 56.) Baiul contends that the damage to her reputation caused by defendants' actions will result in fans not purchasing tickets to her shows, potential advertisers and show promoters becoming leery of working with her, and a decrease in the syndication of two 1994 movies she was involved with, <u>Nutcracker on Ice</u> and <u>Broken Promises: The Oksana Baiul Story</u> (the "Baiul Movies"). (NBC SOF ¶ 140; Baiul-NBC SOF ¶¶ 107-108.) Baiul expects this damage to last for at least ten years. (NBC SOF ¶ 141.)

In calculating her past earnings, Baiul estimates that: she should have earned $40-80 million in royalty income since 1994 from syndication of the Baiul Movies; she would have earned this amount had it not been stolen and concealed from her by a 20-year conspiracy involving dozens of non-parties to this action, including agents, managers, producers, coaches, accountants, and networks; and the reputational damage caused by defendants' alleged conduct will cause her to suffer a hit to this future income for at least the next decade. (NBC SOF ¶ 143; Disson ¶¶ 177-78.) The source for these far-fetched allegations is not factual, but rather allegations in <u>another</u> lawsuit filed by Baiul and Baiul's counsel—<u>Baiul v.</u>

William Morris Agency, LLC et al., 13 Civ. 8683—that is also before this Court. (See Markovich Decl. Ex. 55.)

Baiul declined to answer questions about her finances and her alleged financial damages during her deposition; she authorized Carlo J. Farina, her business manager, to testify on her behalf as to these issues. (NBC SOF ¶ 154.) Farina testified, inter alia, that Baiul cried a lot and had many sleepless nights from April to May 2012, and beginning again in February 2013 (when she filed the instant actions). (Id. ¶¶ 146-47; Baiul-NBC SOF ¶¶ 106-107, 114.) It is undisputed, however, that Baiul has never sought medical attention for this alleged emotional harm. (NBC SOF ¶ 148.)

Though Baiul has submitted copies of her Rule 26(a) disclosure from July 2013 and a table that purports to set forth these earnings estimates (see id. Exs. 56, 58), Baiul has not submitted any documents to support these calculations. (See NBC SOF ¶ 145; Disson SOF ¶¶ 179-83.) Even a quick look at these estimates shows why. The average earnings per year used as an assumption in these calculations—$1,539,428—is directly contradicted by the tax returns for Oksana Ltd. (the legal entity used to conduct Baiul's business ventures) from 2007 through 2011, which do not reflect a gross income above $109,000 for any year and only $3,131 in 2011. (Disson SOF ¶¶ 184-86.) The $115,000 in yearly compensatory damages that Baiul seeks is more than Oksana Ltd. earned in total gross income for the years 2008 through 2011 combined, and more than Oksana Ltd. made in its best year of 2007. (Id. ¶¶ 187-88.) Farina testified at his deposition that he arrived at

$115,000 by multiplying the average yearly earnings of $1,539,428 by 7.47%, which he admitted was a "random" number. (Id. ¶¶ 189-91.)

Both Baiul and Farina testified that, since the alleged conduct by defendants in these actions, Baiul has not received the kinds of offers for skating performances that she had previously received. (Id. ¶ 167.) Between 2007 and August 2010, however, Baiul had only received one offer for a paid skating show. (Id. ¶ 168.) According to Baiul, she only performed in "a couple" of paid skating shows between 2006 and 2011, and none in 2011. (Id. ¶¶ 170-71.) Though Stephen Disson testified that he would not hire someone with the reputation of a no-show, Baiul is personally unaware of anyone who has actually called her a no-show. (Baiul-NBC SOF ¶ 108; NBC SOF ¶ 149.) Finally, Baiul's assertions concerning her future earnings in the skating industry are belied by her August 12, 2011 email to Disson; in response to Disson's questions about why she was no longer interesting in participating in the Disson Shows, Baiul stated that she did not want to skate anymore. (See DeOreo Decl. Ex. T at 1.)

Baiul has not identified a single fan that purchased a ticket for the Moments of Love Show with the expectation that she would be in the Show; in fact, the Press Release was published after the live show, and thus could not have had any impact on these ticket sales. (NBC SOF ¶¶ 162-63.) Baiul cannot identify a single fan or potential show producer who concluded she was a no-show because of the Press Release. (Id. ¶ 164.) Aside from The Entertainment Hotline (which NBCUniversal informed Baiul about directly), Baiul could not identify any source that picked up

the Press Release. (Id. ¶ 165.) Baiul has also presented no evidence as to how many people saw the Press Release, which was not available or targeted to consumers or the general public. (Id. ¶ 166.) As is discussed supra, the Press Release was published too late to have an impact on any advertising sold by Disson or the venues for the Disson Shows. Additionally, at the time all of the sponsors for the Disson Shows agreed to be sponsors, they had all been informed of the current skating cast lists, which did not include Baiul. (Id. ¶ 106.)

In sum, Baiul's alleged damages in the Lanham Act Action are simply wild conjecture and wild speculation; the assumptions she, her business manager, and her attorney used to arrive at the proffered damages calculations are both incredible on their face and directly contradicted by the record evidence offered in support of these motions.

    B.    <u>New York Civil Rights Law § 51</u>

Section 51 of the New York Civil Rights Law ("Section 51") provides "a limited statutory right of privacy." <u>Messenger ex rel. Messenger v. Gruner + Jahr Printing & Publ'g</u>, 727 N.E.2d 549, 551 (N.Y. 2000). Section 51 states, in relevant part: "[a]ny person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purpose of trade without consent first obtained . . . may maintain an equitable action . . . against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use . . . ." N.Y. Civil Rights Law § 51.

New York courts hold that Section 51 "is to be narrowly construed and strictly limited to nonconsensual commercial appropriations of the name, portrait or picture of a living person." <u>Messenger</u>, 727 N.E.2d at 552 (internal quotation marks and citations omitted).  Section 51 does not apply to "to reports of newsworthy events or matters of public interest" in light of the "constitutional values in the area of free speech." <u>Id.</u> (internal quotation marks and citations omitted). "Newsworthiness is to be broadly construed . . . [it] includes not only descriptions of actual events but also articles concerning political happenings, social trends or any subject of public interest." <u>Id.</u> (internal quotation marks and citations omitted).

For the reasons set forth in Section IV.A.1 <u>supra</u>, none of the alleged unauthorized uses in the complaint were used by defendants for trade or advertising purposes.  For the reasons set forth in Section IV.A.2 <u>supra</u>, Baiul fails to proffer any evidence beyond mere conclusory allegations that she has suffered damages as a result of defendants' alleged conduct.  Accordingly, Baiul's Section 51 claim fails, and the Court need not reach the other arguments offered by the NBC Defendants in support of dismissing this claim.

C.   <u>Fraud and Negligent Misrepresentation</u>

Common law fraud under New York law requires that a plaintiff establish (1) a material misrepresentation of fact or omission; (2) made with knowledge of its falsity and the intent to deceive; (3) justifiable reliance; and (4) damages.  <u>Lanzi v. Brooks</u>, 373 N.E.2d 278, 279 (N.Y. 1977).  A claim for common law negligent misrepresentation under New York law "requires the plaintiff to demonstrate (1)

33

the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." <u>Mandarin Trading Ltd. v. Wildenstein</u>, 944 N.E.2d 1104, 1109 (N.Y. 2011).

Baiul bases both of these claims on the May 25, 2012 letter from NBC's in-house counsel to Baiul's prior counsel.[18]  Baiul argues, in substance, that this letter failed to tell Baiul's prior counsel about all of the alleged unauthorized uses of Baiul's name and likeness in connection with the Disson Shows, and that by failing to do so the NBC Defendants committed common law torts. (<u>See</u> Baiul-NBC Opp. at 25; Talbert Decl. Ex. 21.)

These claims fail.  In addition to failing to put forth any non-speculative evidence of damages, <u>see</u> <u>supra</u> Section IV.A.2, there is no evidence of contemporaneous falsity or intent to deceive regarding the May 25, 2012 letter.  The letter states that the inclusion of Baiul's name in the Press Release was an error, it explains how the error occurred, it states that no television advertisements or promotions for the Moments of Love Show included Baiul, and it states that NBC had only been able to locate one other source that had reported on the Press Release. (<u>See</u> Talbert Decl. Ex. 21.)  There is no evidence that any of these statements were false, or that the drafter of the May 25, 2012 letter knew them to be false at the time.

---

[18] Baiul concedes that "Defendant NBC could have said nothing and Plaintiff likely would not have a claim but Defendant NBC chose to tell Plaintiff something other than the truth and Plaintiff has been damaged." (Baiul-NBC Opp. at 25.)

34

## V.    THE LIBEL ACTION

In the Libel Action, against the Disson Defendants only, Baiul asserts sixteen causes of action for libel as a result of quotes or statements attributed to Stephen Disson in articles published in the Daily News on February 4, 2013 and the Post on February 5, 2013. Both articles were about Baiul's filing of the Lanham Act Action.

In New York,[19] "a plaintiff must establish five elements to recover in libel: (1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 176 (2d Cir. 2000) (summarizing New York law).

"Special damages consist of the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." Id. at 179 (internal quotation marks and citations omitted). "[A] writing which tends to disparage a person in the way of his office, profession or trade is defamatory per se and does not require proof of special damages." Id. (internal quotation marks and citations omitted).

---

[19] Baiul's argument that Pennsylvania law applies to her claims in the Libel Action is without merit. Though Baiul notes that Pennsylvania and New York defamation law are not the same, Baiul does not provide any basis to apply Pennsylvania law. (See Baiul-Disson Opp. at 6-7, 13 Civ. 2208, ECF No. 42.) Under New York choice of law rules, the situs of the tort of defamation should control. See Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999) (applying New York choice of law rules). Here, because the allegedly defamatory statements were reported in New York papers describing pending litigation in New York, this Court applies New York law. See PowerDsine, Inc. v. AMI Semiconductor, Inc., 591 F. Supp. 2d 673, 680 (S.D.N.Y. 2008); Test Masters Educational Servs., Inc. v. NYP Holdings, Inc., No. 06 CV 11407 (BSJ), 2007 WL 4820968, at *5 (S.D.N.Y. Sept. 18, 2007); Keogh v. Texaco Inc., No. 97 Civ. 5981 (LMM), 1999 WL 61836, at *5 (S.D.N.Y. Feb. 10, 1999).

Baiul's libel claims arising out of the Daily News and the Post articles fail for a number of reasons. First, Baiul has failed to put forth facts sufficient to create a genuine issue of fact for trial as to the falsity of <u>any</u> of the allegedly libelous statements, let alone that the statements were made with actual malice— knowledge that the statements were false or recklessly disregarding whether they were false or not. See <u>Liberman v. Gelstein</u>, 605 N.E.2d 344, 348 (N.Y. 1992).[20] In fact, with respect to Disson's statement in the Daily News that Baiul had previously missed a dress rehearsal because she was out shopping, Disson explained at his deposition that he heard this information from another well-known figure skater, Baiul admitted during her deposition that her former agent heard the same story, that prior to 2011 it had been gossip in the skating industry that Baiul missed an event because she was out shopping, and that she could not recall whether she ever missed a dress rehearsal. Similarly, with respect to the other statements attributed to Disson concerning his conversations with Baiul, the lack of "public" disclosure of his negotiations with Baiul, and the fact that Disson did not use Baiul in any promotional or marketing materials, there are no facts in the record that suggest that such statements were false. In fact, as is discussed in Section IV.A.1 <u>supra</u>, the record evidence indicates that these statements were true.

---

[20] Baiul is a world famous figure skater who won the 1993 World Championship, Ladies Figure Skating and became the 1994 Olympic Gold Medalist in Ladies Figure Skating. (Disson SOF ¶ 1.) In Baiul's own words, she is "the highest figure skater who's been on TV and my Olympics were the highest rated Olympics," she has "a title given to me by the media queen of the ice," and she considers herself a "superstar" and a "global entertainer." (DeOreo Decl. Ex. G at 382, 424.) It cannot be disputed that Baiul is a public figure for purposes of New York defamation law. Cf. Celle, 209 F.3d at 177 ("Given plaintiff Celle's own characterization of himself as a 'well known radio commentator' within the Metropolitan Filipino-American community, the district court correctly held that he is a public figure.").

Second, many of Baiul's libel claims are barred by the absolute litigation privilege under New York law. "Under New York law, in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation." O'Brien v. Alexander, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) (internal quotation marks and citations omitted) (summarizing New York law). "The absolute privilege embraces anything that may possibly or plausibly be relevant or pertinent, with the barest rationality, divorced from any palpable or pragmatic degree of probability." Grasso v. Mathew, 564 N.Y.S.2d 576, 578 (N.Y. App. Div. 1991). Courts have applied this privilege well beyond statements in pleadings and in court to, inter alia, statements "by an attorney in a magazine article quoting from and restating the allegations of the complaint." O'Brien, 898 F. Supp. at 171. As a result, Disson's statements concerning the Lanham Act Action, including his description of the suit as "just weird," clearly fall within this privilege and may not serve as a basis for a libel action.

Third, Baiul fails to proffer any non-speculative evidence as to the damages she has suffered as a result of Disson's allegedly defamatory statements. In the Libel Action, Baiul seeks more than $40,000,000 in combined damages for the sixteen libel causes of action she asserts, as a result of variations on the same lost earnings calculations (with their specious assumptions) used in the Lanham Act Action. (See Markovich Decl. Exs. 57, 58.) As previously discussed, see supra

Section IV.A.2, these damages assumptions and calculations are wholly without a basis in fact and are rejected.[21]

VI.    CONCLUSION

For the reasons set forth above, defendants' motions for summary judgment in both the Lanham Act Action and the Libel Action are GRANTED and these actions are DISMISSED.

The Clerk of Court is directed to close the motions at ECF Nos. 31 and 47 in 13 Civ. 2205, and at ECF No. 35 in 13 Civ. 2208.  The Clerk of Court is also directed to close both actions.

SO ORDERED.

Dated:      New York, New York
            April 2 4, 2014

                                   KATHERINE B. FORREST
                                   United States District Judge

---

[21] To the extent Disson's statement concerning Baiul's failure to show up for a dress rehearsal on one prior occasion references Baiul's business, profession, or trade, it remains non-actionable because of the single instance rule.  This rule "applies where a publication charges a professional person with a single error in judgment, which the law presumes not to injure reputation."  Celle, 209 F.3d at 180 (quoting Armstrong v. Simon & Schuster, Inc., 649 N.E.2d 825, 828 n.5 (N.Y. 1995)).